UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
ANDRE ANDERSON,

                 Plaintiff,                           Case No.: 21 Civ. 3569

         -against-

                                           **FIRST AMENDED**
                                           **COMPLAINT**
LOUIS A. MOLINA, in his official capacity, SARENA
TOWNSEND, Individually and Professionally,  RUBEN
BENITEZ, Individually and Professionally,  DEION               **Jury Demand**
ISLAR, Individually and Professionally,
CHRISTOPHER DIXON, Individually and Professionally,
and NEW YORK CITY, New York,

                   Defendants.
------------------------------------------------------------------x

        Plaintiff, ANDRE ANDERSON, by his attorneys The Bellantoni Law Firm, PLLC,

complains against the defendants in his First Amended Complaint as follows:

## NATURE OF THE ACTION

        1.      This is an action for compensatory, economic, and punitive damages as well as

injunctive relief, attorney's fees and costs proximately resulting from the actions of the

defendants' violations of the plaintiff's Constitutional Rights under the Second Fourth and

Fourteenth Amendments pursuant to 42 U.S.C. § 1983.

## JURISDICTION

        2.      The Court's jurisdiction over the plaintiff's federal claims is invoked pursuant

to 28 U.S.C. § 1331, § 1343.

## THE PARTIES

        3.      Plaintiff, ANDRE ANDERSON, (hereinafter "Plaintiff") is a citizen

of the United States and a domiciliary of Nassau County, New York.

4.     Plaintiff is employed by New York City as a Correction Officer with the New York City Department of Correction. Plaintiff had no disqualifiers to the possession of firearms, nor does he have any disqualifiers to date.

5.     Defendant NEW YORK CITY, is a municipal subdivision of the State of New York.

5(a).   Defendant, LOUIS A. MOLINA, sued in his official capacity only, is the Commissioner of the New York City Department of Correction.

6.     At all times relevant to these allegations, Defendant SARENA TOWNSEND ("Townsend"), sued herein in her individual and professional capacity, was  the Deputy Commissioner of Investigation and Trials for the New York City Department of Correction.

7.     In that  capacity defendant Townsend was a final decision maker with regard to the seizure of "service handguns", "personal handguns", and "service long arms" as those terms are defined in Directive 4511R-B I (C) upon the suspension of a NYC correction officer.

8.      Defendant Townsend is also a final decision maker with regard to the release and return of "service handguns", "personal handguns", and "service long arms" as those terms are defined by Directive 4511R-B I (C).

9.     Respondent RUBEN BENITEZ ("Benitez"), sued herein in his individual capacity, is the Assistant Commissioner of Investigation and Trials for the New York City Department of Correction. Benitez, at all times relevant to the allegations herein, acted in concert with Townsend.

10.     Defendant DEION ISLAR ("Islar") sued herein in his individual capacity, is an investigator with the New York City Department of Correction.

11.     Defendant CHRISTOPHER DIXON ("Dixon") sued herein in his individual capacity, is an investigator with the New York City Department of Correction.

## MATERIAL FACTS

12.     By this action, Plaintiff seeks redress from this Court in connection with Defendants' unlawful seizure of his personal handgun and rifle, neither of which were "Service Handguns", "Personal Handguns", or "Service Long Arms" as those terms are defined in Directive 4511R-B I (C) on July 25, 2020 and Defendants' persistent and unlawful refusal to return such property.

13.     Plaintiff has been employed by New York City as a Correction Officer with the New York City Department of Corrections ("DOC") since December 2016.

14.     In his employment with DOC, Plaintiff has been assigned to the Emergency Service Unit ("ESU") division since 2018.

15.     The DOC ESU is a chosen, prestigious assignment within the DOC.

16.     ESU members, like Plaintiff, respond to all emergencies within the department, both on and off Rikers Island, including fire emergencies, high security inmate transport, riot control, inmate escapes, tactical security operations, cell extractions, perimeter security/ response, confined space rescue, vehicle emergencies and motor vehicle accidents.

17.     ESU teams respond to all emergency drills (i.e. Fire Evacuation, Yard Drills), provide EMT response, and assists the Port Authority with air disasters and/or emergency-related events.

18.     ESU also assists the Special Operations Division of the DOC with security breaches and enhanced security for Rikers Island during emergencies.

19.     ESU officers are at-the-ready to participate in all scheduled and unscheduled searches and respond to all jail-based incidents.

20.     ESU officers are responsible for the distribution, repair and maintenance of the departmental chemical agents supply, and provide chemical agent training for new recruits, in-service training, and facility training on cell extractions, defensive tactics, handcuffing, and escort procedures.

21.     Plaintiff has, at all times, performed his duties as a member of the ESU in an exemplary manner.

### Membership in the New York Joint Task Force Empire Shield

22.     In addition to his employment with DOC, Plaintiff is a member of the Joint Task Force Empire Shield from 2015-2016.

23.     The Joint Task Force Empire Shield is an element of the New York State Division of Military and Naval Affairs engaged and responsible for the military defense of New York City, with an emphasis on the deterrence and prevention of internal security threats.

### Active Military Duty as a Military Police Officer and LEOSA Firearm Credentials

24.     Plaintiff is an Active Military Police/Law Enforcement Officer with the New York Army National Guard.

25.     Plaintiff has been a member of the National Guard since 2014.

26.     Plaintiff has been a Military Police Officer ("MP") since 2019.

27.     As an MP, Plaintiff is credentialed under the Law Enforcement Officers Safety Act.

28.     The Law Enforcement Officers Safety Act (LEOSA) is a United States federal law, enacted in 2004, that allows two classes of persons - the "qualified Law Enforcement Officer" and the "qualified retired Law Enforcement Officer" - to carry a concealed firearm in any jurisdiction in the United States or United States Territories, regardless of state or local laws, with certain exceptions.

29.     Plaintiff is a "qualified Law Enforcement Officer" under LEOSA.

30.     Since January 5, 2021, Petitioner has been on Active-Duty status.

### *Events of July 25, 2020 Leading to Plaintiff's Suspension By Defendant Townsend*

31.     On July 25, 2020, while Plaintiff was off-duty and driving home, another vehicle rear-ended his vehicle.

32.     Plaintiff exited his vehicle to assess the damage and identified that a Honda Pilot ("Honda") had rear-ended him.

33.     Plaintiff observed two occupants inside the Honda and approached the vehicle to exchange their driver's license, insurance, and registration. In response, the driver stated, "I got $3,000, I'll pay for that. When we get off the bridge, I will give you the information."

34.     When Plaintiff refused this proposal and requested that the driver exit his vehicle to exchange the necessary information, the driver placed the Honda in reverse and fled the scene.

35.     Plaintiff returned to his vehicle and immediately contacted 911 and identified himself as an off-duty Officer who was involved in a hit-and-run accident.  Plaintiff advised the dispatcher that he was following the Honda, provided a description of the vehicle, and requested assistance. As Plaintiff continued to follow the Honda, he observed the Honda strike a second vehicle causing both vehicles to collide into the barrier of the Cross Island

Parkway.

36.     As a trained and registered Emergency Medical Technician, Plaintiff provided the dispatcher with an update regarding the subsequent accident and his belief that an ambulance would be necessary as the impacted vehicle was pinned to the barricade.

37.     Plaintiff stopped his vehicle approximately 60 feet from the Honda. As Plaintiff was exiting his vehicle, he observed the driver of the Honda exit his vehicle and flee the scene on foot by jumping off the Cross-Island Parkway to an adjacent highway below.

38.     Plaintiff proceeded toward the collision and assessed that the driver of the impacted vehicle was severely injured.

39.     At this time, the passenger of the Honda exited the vehicle and advanced toward Plaintiff. Plaintiff observed that the passenger had hidden his hand within the waistband of his shorts.

40.     Consistent with his law enforcement training and experience, Plaintiff commanded the passenger to "get back" while Plaintiff proceeded to walk backward.

41.     Within seconds, however, the passenger charged toward Plaintiff. Plaintiff was unable to reasonably determine whether the assailant was holding a weapon in the hand that was hidden in his shorts.

42.     Based on the totality of the circumstances, Plaintiff was reasonably in fear for his personal safety and his life.

43.     Consistent with his law enforcement training and experience, as well as Penal Law Article 35, and in fear of his safety, Plaintiff drew his registered personal firearm, identified himself as a police officer, and ordered the passenger to get on the floor.

43(a).   The firearm that Plaintiff possessed and drew was a Glock 19 handgun, personally owned by Plaintiff. Plaintiff's Glock 19 handgun was a "Personal Handgun" as that term is defined by DOC regulation 4511R-B I (C) 2, as it is a "handgun owned  by a member of service that is authorized by the department for use as either a "carry" or "recreational" purpose".

44.   After observing Plaintiff's firearm, the passenger complied with Plaintiff's orders and laid on the ground.

45.   Civilian witness Mia Blackwell ("Ms. Blackwell") was an eyewitness to the incident.

46.   Ms. Blackwell assisted Plaintiff by retrieving handcuffs from Plaintiff's personal vehicle.

47.   Plaintiff remained on the phone with the 911 dispatcher throughout the entire incident and detained the passenger until responding police officers arrived.

48.   The responding police officers searched the Honda and located a knife in the shape of a dagger behind the passenger seat of the vehicle.

49.   Once the officers processed the accident, Plaintiff was advised to call the police station for a full report.

50.   Plaintiff's actions were fully investigated by the NYPD and MTA Triborough Bridge and Tunnel Authority, who determined that Plaintiff acted lawfully.

51.   Plaintiff was not charged or arrested in connection with this incident, nor was there a finding of wrongdoing on Plaintiff's part.

*Plaintiff Promptly Notified DOC of the Incident*

52.    After the July 25, 2020 incident, Petitioner promptly notified ESU Captain Flemings of the events and the information was reported up the chain of command, ultimately resulting in the creation of an internal Central Operations Desk ("COD") report.

*Plaintiff Objected to the Seizure of His Sig Sauer P365 Handgun and M&P15 Rifle*

53.    On July 25, 2020, Defendants Townsend and Benitez ordered Petitioner's suspension without pay as well as the seizure of Plaintiff's on-duty handgun (the Glock 19), and a handgun (Sig Sauer P365) and rifle (M&P 15) that were not subject to the terms of Plaintiff's employment with DOC as neither one is a "Service Handgun", Personal Handgun", or Service Long Arm" as those terms are defined in DOC Directive 4511R-B I (C) .

54.    Plaintiff's Sig Sauer P365 is not a "Personal Handgun" because as it is not a "handgun owned  by a member of service that is authorized by the department for use as either a "carry" or "recreational" purpose" handgun.

55.    Unlike Plaintiff's Glock 19 handgun, which is a "Personal Handgun", and further a "Carry Handgun" as those terms are defined in Directive 4511R-B I (C), Plaintiff's Sig Sauer P365 was purchased using Plaintiff's military credentials, is used solely for and in connection with Plaintiff's military service, is not used as a "Recreational Handgun" or a "Carry Handgun" as those terms are defined in Directive 4511R-B I  (C).

56.    Plaintiff's M&P 15 rifle is not a "Service Long Arm" as it is not a "department owned and authorized rifle…issued to a member of service for on-duty purposes" under Directive 4511R-B I (C). Plaintiff personally owns his M&P 15 rifle; it was not department owned or issued and was not used or possessed in conjunction with his employment with DOC.

57.     Defendants had not conducted any independent investigation of the July 25, 2020 events before suspending Plaintiff.

58.     At approximately 12:00 p.m. on July 25, 2020, Investigator Deion Islar and Christopher Dixon arrived at Plaintiff's residence and notified Plaintiff that he had been suspended for 30 days without

pay.

59.     Defendants Islar and Dixon confiscated Petitioner's DOC identification and DOC Shield, in accordance with the agency's protocols for suspensions.

60.     Investigators Islar and Dixon then ordered Plaintiff to turn over ***all*** of the handguns and long guns that he owned and possessed, not solely those constituting "Service Handguns", "Personal Handguns" and/or "Service Long Guns" as defined by Directive 4511R-B I (C).

61.      Investigators Islar and Dixon acted independently and at the direction of Townsend and/or Benitez when ordering Plaintiff to surrender all of his handguns, not solely those constituting "Service Handguns", "Personal Handguns" and/or "Service Long Guns" as defined by Directive 4511R-B I (C).

62.     Plaintiff did not object to the initial seizure of his Glock 19 handgun. Plaintiff's Glock 19 was a "Personal Handgun";  it was authorized by the department as a "Carry Handgun" on the job as well as a "Recreational Handgun" when Plaintiff was off-duty.

61.     Under DOC policies and procedures, Plaintiff's Glock 19 handgun was on the DOC list of "authorized" personal handguns and had been registered by the DOC for off-duty carry.

62.     Plaintiff's Glock 19 handgun was approved by, and registered with, the DOC for Plaintiff's official on-duty firearm carry in his position as an ESU Officer and was subject to required surrender upon initial suspension under DOC policies.

63.     Plaintiff specifically protested and objected to the seizure of his Sig Sauer P365 handgun and his Smith & Wesson M&P 15 rifle by Defendants Islar and Dixon.

64.   Plaintiff explained to Defendants Islar and Dixon that neither they nor anyone else from the DOC had any authority to seize, nor any authority over, his Sig Sauer handgun or his M&P 15 rifle.

65.     In fact, no Defendant had the legal authority or privilege to seize Plaintiff's M&P 15 rifle or his Sig Sauer P365 handgun.

66.      No search or seizure warrant exists authorizing the seizure or retention of Plaintiff's Sig Sauer P365 handgun and/or his M&P 15 rifle and no exception to the warrant requirement existed to seize Plaintiff's Sig Sauer P365 handgun and/or his M&P 15 rifle, which constitutes an unreasonable seizure.

67.     Plaintiff's firearms were lawfully possessed by Plaintiff; they were not evidence of a crime nor were they contraband.

68.     Plaintiff explained to Defendants Islar and Dixon that his Sig Sauer P365 handgun is his personally owned handgun authorized by Plaintiff's Military Police Commander for Plaintiff to carry during his service in the Army National Guard.

69.     Over Plaintiff's objections, Defendants Islar and Dixon seized Plaintiff's Sig Sauer P365 and Smith & Wesson M&P 15 rifle.

70.     Notwithstanding that Plaintiff had committed no criminal offense and had no disqualifiers to firearm possession, Defendants had no legal jurisdiction or authority to seize

Plaintiff's Sig Sauer P365 or M&P 15 rifle.

71.     Directive 4511R-B III provides that a staff member who is suspended from duty and/or placed on modified assignment shall be issued an identification card indicating "Suspension from Duty and/or Placement on Modified Assignment". Under this section, a "No Firearm" identification means that the staff member is not permitted to possess, carry, handle, or purchase any type of firearm and shall not be assigned to any post on which firearms are handled or stored." Such staff members "shall be [*inter alia*] prohibited from purchasing any type of firearm for personal or recreational use."

72.     Directive 4511R-B III is directed at, and bans, the "possession, carriage, handling, and purchase" of any and all types of firearms, including handguns, shotguns, and rifles, whether those firearms are related to or in the course of a staff member's employment, including those defined in Directive 4511R-B § I (C), in the course of their personal lives, and/or off-duty.

73.     Directive 4511R-B § III violates the Second Amendment to the U.S. Constitution by barring the possession, use, purchase, and receipt of firearms generally, not only those purchased, used, possessed, handled, and/or received in connection with their DOC credentials and/or employment.

74.     Directive 4511R-B § III violates the Fourth Amendment to the U.S. Constitution by barring the possession and use of one's individual firearms/property that were not purchased, used, possessed, handled, and/or received in connection with their DOC credentials and/or employment.

75.     Directive 7504R-A § III (B)(3)(b) provides, "Members of the Department shall also surrender all handguns that they own or possess to the supervisor notifying the member of the suspension;"

76.     Directive 7504R-A § III (B)(3)(b) violates the Fourth and Fourteenth Amendments to the U.S. Constitution by authorizing the summary seizure of, and requiring the summary surrender of, all handguns that a staff member owns and/or possesses not only those purchased, used, possessed, handled, and/or received in connection with their DOC credentials and/or employment.

77.     Directive 7504R-A § III (C)(1)(d) provides that the supervisor effecting a suspension shall "[o]btain all Department property and handguns owned or possessed (if applicable) and supply suspended employee with a receipt."

78.     Directive 7504R-A § III (C)(1)(d) violates the Fourth and Fourteenth Amendments to the U.S. Constitution by authorizing the summary seizure of, and requiring the summary surrender of, all handguns that a staff member owns and/or possesses not only those purchased, used, possessed, handled, and/or received in connection with their DOC credentials and/or employment.

79.     The aforementioned DOC regulations apply to all manner of suspensions, not only those based on, for example, a staff member's arrest for a felony or other serious offense.

80.     Even if such regulations applied only in the case of an arrest for a felony conviction of other serious offense, the regulations would be unconstitutional.

81.     Defendant failed to provide Plaintiff with any post-deprivation hearing and/or procedure for the return of his Sig Sauer handgun and M&P Rifle.

82.     A state Article 78 proceeding is an insufficient means for seeking redress for Plaintiff's constitutional violations.

83.     A state Article 78 proceeding does not provide a "prompt post-deprivation remedy".

84.     On March 19, 2021 – close to one year ago - Plaintiff filed an Article 78 proceeding related to Defendants' seizure, and the return of, of Plaintiff's on-duty Glock 19 handgun. To date, no determination has been made in the state courts. The state Article 78 process does not provide a constitutionally adequate post-deprivation remedy. See, *Weinberg v. Vill. of Clayton, New York*, 537 F. Supp. 3d 344, 360 (N.D.N.Y. 2021) ("Although Plaintiffs could have brought an Article 78 proceeding in State court, this remedy would have likely taken a substantial amount of time and expense while Plaintiffs' rights remained in limbo, and the same is true for other litigation.") citing, *Panzella v. Sposato*, 863 F.3d 210, 218 (2d Cir. 2017).

85.     Defendants' warrantless, administrative seizure of a handgun unrelated to Plaintiff's employment with DOC was an unreasonable seizure in violation of the Fourth Amendment.

86.     Defendants' warrantless, administrative seizure of a handgun from Plaintiff's home was an unreasonable seizure in violation of the Fourth Amendment.

87.     Defendants are not entitled to qualified immunity because no reasonable person in Defendants' position would believe that the warrantless seizure of a handgun unrelated to Plaintiff's employment was reasonable or justified.

88.     Defendants are not entitled to qualified immunity because no reasonable person in Defendants' position would believe that the warrantless seizure of a handgun from Plaintiff's home was reasonable or justified.

89.     Defendants knew or should have known that Plaintiff's M&P 15 rifle was not a "Service Long Arm", yet they acted with deliberate indifference and disregarded the risk that his constitutional rights would be violated.

90.     Defendants' warrantless, administrative seizure of Plaintiff's non-department owned M&P 15 rifle (therefore, not a "Service Long Arm") was an unreasonable seizure in violation of the Fourth Amendment.

91.     Defendants' warrantless, administrative seizure of Plaintiff's non-department owned M&P 15 rifle (therefore, not a "Service Long Arm") from Plaintiff's home was an unreasonable seizure in violation of the Fourth Amendment.

92.     Defendants are not entitled to qualified immunity because no reasonable person in Defendants' position would believe that the warrantless seizure of Plaintiff's M&P 15 rifle, which was not department owned (therefore, not a "Service Long Arm") was reasonable or justified.

93.     Defendants knew or should have known that Directive 7504R-A III (C)(1)(d) Does NOT authorize Defendants to seize "rifles or shotguns"; the language is limited to "handguns owned or possessed", yet they acted with deliberate indifference and disregarded the risk that Plaintiff's constitutional rights would be violated.

94.     Defendants are not entitled to qualified immunity because no reasonable person in Defendants' position would believe that the warrantless seizure of Plaintiff's M&P 15 rifle,

which was not department owned (therefore, not a "Service Long Arm") from Plaintiff's home was reasonable or justified.

95.    In the event that the aforementioned DOC regulations do not authorize the warrantless seizure of any and all handguns upon the suspension of a staff member, even handguns not falling within the definition of a "Service Handgun" or "Personal Handgun" under Directive 4511R-B (C) , New York City is liable for its failure to train its employees, including the named Defendants, for the unlawful seizure of Plaintiff's Sig Sauer P365 handgun.

96.    To the extent that DOC regulations do not authorize the warrantless seizure of handguns from a staff member's home, including handguns not falling within the definition of a "Service Handgun" or "Personal Handgun" under Directive 4511R-B (C) , New York City is liable for its failure to train its employees, including the named Defendants, for the unlawful seizure of Plaintiff's Sig Sauer P365 handgun. New York City's failure to train and/or supervise Defendants resulted in their deliberate indifference and disregarded the risk that Plaintiff's constitutional rights would be violated.

97.    New York City is liable for the failure to train and/or supervise Defendants with regard to the aforementioned regulations for the unlawful seizure of Plaintiff's M&P 15 rifle because no such authorization to seize a non-department, personally owned rifle exists in the cited regulations.  New York City's failure to train and/or supervise Defendants resulted in their deliberate indifference and disregard for the risk that Plaintiff's constitutional rights would be, and were, violated.

***Multiple Requests for the Return of Plaintiff's Sig Sauer P365 Handgun and M&P15 Rifle***

98.   Defendants had no cognizable legal authority to seize Plaintiff's Sig Sauer P365 Handgun or his M&P 15 rifle.

99.   Defendants have no cognizable legal authority for refusing to return Plaintiff's Sig Sauer P365 handgun or M&P 15 rifle.

100.   Multiple requests have been made by Plaintiff directly and/or through his counsel to Defendants Townsend and Benitez for the return of Plaintiff's Sig Sauer P365 handgun.

101.   Multiple requests have been made by Plaintiff directly and/or through his counsel to Defendants Townsend and Benitez for the return of Plaintiff's M&P 15 rifle.

102.   Defendants Townsend and Benitez have consistently refused to return Plaintiff's Sig Sauer P365 handgun and M&P 15 rifle.

103.   Defendants Townsend and Benitez have been informed that Plaintiff's Sig Sauer P365 was issued in connection with, and is required for his service with, the Army National Guard.

104.   The acts and omissions of Defendants Townsend and Benitez are negatively affecting Plaintiff's mission readiness in the Army National Guard as related to his weapons efficiency and qualifications.

105.   Defendants Townsend and Benitez were personally informed that their refusal to return Plaintiff's Sig Sauer P365 is negatively affecting Plaintiff's mission readiness in the Army National Guard as related to his weapons efficiency and qualifications.

106.   The actions and omissions of Defendants Townsend and Benitez are negatively affecting Plaintiff's ability to protect himself.

107.    Defendants' actions were undertaken, and continue to be undertaken, with actual malice and in deliberate disregard for Plaintiffs' property rights and due process rights as protected by the Constitution.

108.    Notwithstanding that Defendants have no jurisdiction over Plaintiff's Sig Sauer P365 or his M&P 15 rifle and no legal authority or privilege for the initial seizure or continued retention of Plaintiff's property:

- Townsend and Benitez continue to unlawfully retain such property knowing that Plaintiff committed no criminal act;

- Townsend spoke with NYPD Captain Yam and an MTA TBTA Lieutenant Aristizabal on July 28, 2020 who confirmed that Plaintiff acted lawfully, reasonably, and well within his authority during the events of July 25, 2020; Townsend also read Lieutenant Aristizabal's written report, which commended Plaintiff's actions;

- Townsend and Benitez continue to unlawfully retain such property knowing that, even if Plaintiff had committed a criminal act on July 25, 2020 they have no jurisdiction to seize or retain such property;

- Townsend's personal malice is borne out through the expressions of her personal opinion, "I don't feel like you should have gotten out of your car" and "I don't feel like you should have pulled your gun out on the passenger" even though he was advancing on Plaintiff with his hand in his waistband in contravention of Plaintiff's verbal commands that he was a law enforcement officer and to stay back; and

- Townsend and Benitez continue to unlawfully retain Plaintiff's firearms even after listening to the 911 recording, which confirmed the veracity of Petitioner's statements, his lawful actions, and the sequence of events.

109.    When Plaintiff contacted Defendants Townsend and Benitez about the return of his Sig Sauer P365 and M&P 15 rifle in the Fall 2020, Captain Fuller of the Investigations Unit informed him that Townsend instructed her to tell Plaintiff, "You call here again and we will file Harassment charges against you with the NYPD. You not getting it back."

110.    On March 19, 2021, Plaintiff filed an employment-related Article 78 proceeding against Defendants Townsend and Benitez, in their official capacities only, which is pending in the New York County Supreme Court.

111.    Plaintiff's Article 78 proceeding does not involve or seek the return of the property/firearms that are the subject of this action.

112.    On or about April 20, 2021, Benitez was contacted by Major Kenniff of the New York Army National Guard regarding the return of Plaintiff's Sig Sauer P365 handgun in connection with his service duties.

113.    Benitez informed Major Kenniff, in substance, that Plaintiff's Sig Sauer P365 will not be returned because Plaintiff "filed a lawsuit, which makes it difficult to release anything" so long as the litigation is pending.

114.    Benitez did not offer any other reason for the seizure or the continued retention of Plaintiff's Sig Sauer P365 or his M&P 15 rifle by himself and Townsend.

115.    As a result of the aforementioned allegations, Plaintiff continues to suffer, *inter alia*, the deprivation of his Second, Fourth, and  Fourteenth Amendment rights, actual economic loss; loss of the possession, use and enjoyment of his personal property, to wit, the Sig Sauer P365 handgun and M&P 15 rifle; harm to his professional and personal reputation; embarrassment; and mental anguish.

116.     As a direct and proximate cause of Defendants' actions and omissions, Plaintiff claims compensatory, economic, and punitive damages, attorney's fees, injunctive relief, costs and disbursements.

117.     As a direct and proximate cause of Defendants' actions and omissions, Plaintiff has been caused to suffer, *inter alia*, economic loss of no less than $2,500, compensatory damages of no less than $10,000, punitive damages in an amount of no less than $50,000 as to each of the individual defendants, and the cognizable violation of his constitutionally protected rights warranting damages *per se* in at least a nominal amount.

### AS AND FOR A FIRST CAUSE OF ACTION
**(Defendants Islar, Dixon, Townsend and Benitez)**

118.   Repeats and realleges paragraphs 1 through 117 as if fully set forth herein.

119.   Under the theory that the defendants violated Plaintiff's Fourth Amendment rights under 42 U.S.C. § 1983 by the unreasonable seizure of Plaintiff's Sig Sauer P365 handgun and/or his M&P 15 rifle.

### AS AND FOR A SECOND CAUSE OF ACTION
**(Defendants Islar, Dixon, Townsend and Benitez)**

120.   Repeats and realleges paragraphs 1 through 119 as if fully set forth herein.

121.   Under the theory that the defendants violated Plaintiff's Fourteenth Amendment rights to pre-deprivation due process under 42 U.S.C. § 1983 in connection with the seizure of his Sig Sauer P365 and/or his M&P 15 rifle.

### AS AND FOR A THIRD CAUSE OF ACTION
**(Defendants Townsend and Benitez)**

122.   Repeats and realleges paragraphs 1 through 121 as if fully set forth herein.

123.     Under the theory that defendants Townsend and Benitez violated Plaintiff's Fourteenth Amendment rights to post-deprivation due process under 42 U.S.C. § 1983 by providing no process through which Plaintiff can recover his personal property.

### AS AND FOR A FOURTH CAUSE OF ACTION
### (Defendant New York City)

124. Repeats and realleges paragraphs 1 through 123 as if fully set forth herein.

125.   Under the theory that New York City violated Plaintiff's Fourth Amendment rights under 42 U.S.C. § 1983 by failing to properly train and/or supervise Defendants, resulting in their deliberate indifference and disregard for the risk that Plaintiff's constitutional rights would be violated.

### AS AND FOR A FIFTH CAUSE OF ACTION
### (*Monell* Liability Against New York City)

126.    Repeats and realleges paragraphs 1 through 125 as if fully set forth herein.

127.     Under the theory that New York City's policies caused the deprivation of Plaintiff's constitutional rights and, as such, New York City is liable for the acts and omissions of the individually named Defendants.

### AS AND FOR A SIXTH CAUSE OF ACTION
### (New York City)

128.    Repeats and realleges paragraphs 1 through 127 as if set forth fully herein.

129.    Under the theory that the DOC regulations challenged herein violate Plaintiff's Second Amendment rights under 42 U.S.C. § 1983 by banning his possession, ownership, handling, purchase, and receipt of firearms.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (New York City)

130.    Repeats and realleges paragraphs 1 through 129 as if set forth fully herein.

131.    Under the theory that the DOC regulations challenged herein, by preventing the possession, carriage, handling, and purchase" of any and all types of firearms, including handguns, shotguns, and rifles, whether those firearms are related to or in the course of a staff member's employment violate Plaintiff's Fourth Amendment under 42 U.S.C. § 1983 by banning his ownership, use, and enjoyment of his private and personal property.

WHERFORE, a Judgment is respectfully requested against the defendants and in favor of the plaintiff:

- •    Ordering the return of plaintiff's property/firearms;

  Enjoining and striking as unconstitutional the DOC directives challenged herein;

- •    Awarding against each and every defendant compensatory damages as the jury may determine;

- •    Awarding against each and every individual defendant punitive damages in an amount to be determined by a jury;

- •    Awarding against each and every defendant economic damages;

- •    Awarding costs, disbursements, and reasonable attorney's fees pursuant to 42 U.S.C. § 1988; and

- •    Granting such other and different relief as the Court deems just, equitable, and

proper.

Dated: February 2, 2022
   Scarsdale, New York

         THE BELLANTONI LAW FIRM, PLLC
         *Attorneys for Plaintiff*

     By:  _____/s/_____
         Amy L. Bellantoni (AB3061)
         2 Overhill Road, Suite 400
         Scarsdale, New York 10583
         (914) 367-0090 (t)
         (888) 763-9761 (f)
         abell@bellantoni-law.com